E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
Assistant United States Attorney
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-8452
    Facsimile:  (213) 894-0141
    E-mail:     thomas.rybarczyk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-00612(A)-ODW |
|---|---|
|        Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MARK HANDEL |
|        v. | Sentencing: November 6, 2023 |
| MARK HANDEL, | Time:      8:30 a.m. |
|        Defendant. | Location:  Courtroom of the Hon. Otis D. Wright |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Thomas F. Rybarczyk, hereby files its sentencing position for defendant MARK HANDEL.

///
///
///
///

The government's sentencing position is based upon the attached memorandum of points and authorities, the attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 23, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

_/s/ Thomas F. Rybarczyk_
THOMAS F. RYBARCZYK
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

I.    INTRODUCTION..............................................................1

II.   STATEMENT OF FACTS.........................................................2

III.  PROCEDURAL HISTORY.........................................................7

IV.   ARGUMENT...................................................................8

      A.    The Guidelines Calculation: Defendant's Total Offense
          Level Is 22, and His Guidelines Range Is 41 to 51
          Months....................................................8

          1.    The Parties Agreed Upon Sentencing Guidelines
              Factors..........................................8

          2.    Sophisticated Means Under U.S.S.G. §
              2B1.1(b)(10)(C)..................................10

          3.    Sophisticated Means Under U.S.S.G. § 2T1.1(b)(2)....12

          4.    Multi-Count Adjustment Under U.S.S.G. § 3D1.4.......13

          5.    Defendant's Guidelines Range Is 41 to 51 Months'
              Imprisonment.....................................14

      B.    The Government's Recommendation: A Sentence of 51
          Months'  Imprisonment and a Fine of $20,000 Is
          Necessary to Punish and Deter...........................15

          1.    A Significant Sentence Imposed Must Punish
              Defendant for His Egregious Conduct..............15

          2.    Defendant Needs a Significant Sentence to Deter
              Both Him and Others From Engaging in the Same
              Conduct..........................................16

          3.    The Court Should Impose a Fine of $20,000..........18

V.    CONCLUSION.................................................................18

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3      Defendant MARK HANDEL ("defendant") was the living embodiment of

4 the company he created to defraud his creditors and the government --

5 DTTM.  According to those who knew him, defendant said DTMM stood for

6 "Don't Touch My Money."  That is exactly what defendant had succeeded

7 in doing to his creditors and the Internal Revenue Service ("IRS"),

8 until the government uncovered the millions of dollars in income and

9 other assets he lied about to the bankruptcy court and IRS.

10     For his fraudulent conduct, defendant pled guilty to a First

11 Superseding Information charging him with a False Statement in

12 Bankruptcy, in violation of 18 U.S.C. § 152(3), and Subscribing to a

13 False Tax Return, in violation of 18 U.S.C. § 7206(1).  On October 2,

14 2023, the United States Probation Office ("USPO") filed a Presentence

15 Investigation Report ("PSR") in which it determined that defendant's

16 total offense level under the United States Sentencing Guidelines

17 ("USSG") is 23, his criminal history category is I, and his

18 Guidelines sentencing range is 41 to 51 months' imprisonment and a

19 fine between $20,000 and $200,000.

20     While the government disagrees with the manner in which the USPO

21 calculated the tax loss figure and therefore the total offense level,

22 it otherwise concurs with the USPO's conclusions the regarding base

23 offense level for defendant's bankruptcy fraud and specific offense

24 characteristics for both of defendant's crimes as well as the

25 criminal history category for defendant.  Given the premeditated

26 nature of defendant's crimes, his sophistication in executing them,

27 and how brazen he was in doing so, a significant sentence is

28 necessary both to deter this specific defendant, who, according to

the USPO, continues to withhold information concerning his financial affairs.  Just as important, a significant sentence is needed to generally deter these types of crimes, especially since neither the bankruptcy trustee nor the IRS can police and bring to justice every fraudster and tax cheat.  Accordingly, for these reasons and others discussed below, the government believes a sentence of 51 months' imprisonment followed by a three-year term of supervised release and a fine of $20,000 is sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a).[1]

## II.   STATEMENT OF FACTS[2]

### Background

Defendant is a real estate developer residing in Los Angeles County.  For over 30 years, defendant has bought, sold, and developed commercial real estate.

DTMM Construction Inc. ("DTMM") was a corporation that defendant caused to be registered in his wife's name but through which defendant used to deposit the profits from his own work as a real estate developer and to pay for defendant's and his family's living expenses.  Defendant told Individual A that DTMM means "Don't Touch My Money," which is what one of defendant's business partners understood it to mean, too. (Ex. 1 at USAO_0144990; Ex. 2 at USAO_0028770.[3])  With the assistance of his accountant/business

---

[1] The USPO recommended that defendant be sentenced to 46 months' imprisonment, three years' supervised release, and a $20,000 fine. (Dkt. 117.)

[2] Unless otherwise noted, the Statement of Facts is based on the Factual Basis in defendant's plea agreement and PSR.

[3] The government is seeking to file under seal all the exhibits referenced to herein.

1   partner (Individual B), defendant purposefully concealed his income

2   from Investors Capital Group, Lone Pine Investors Group, LLC, Lone

3   Pine Investors Group 2, LLC, Duarte Development 15, LLC, 2013

4   Opportunity Fund A LLC, Future Growers, LLC, BSVercom, LLC, Harbor

5   City 10, LLC, and SJC Peppertree LLC by depositing this income into

6   DTMM and its accounts.

7        According to one of Individual B's employees, Individual B had

8   her label all income going into DTMM as a "Loan from [Individual A]"

9   or "Loan from [Individual B]" (Ex. 3 at USAO_0097654).  Further, this

10  same employee confirmed that DTMM was used to pay defendant's

11  personal expenses. (Id. at USAO_0097661-USAO_0097663).  However, the

12  investigation uncovered no loan agreements.  In addition, the

13  investigation of defendant's email account found that defendant was

14  forwarded account information and asked to approve of payments to

15  service providers, as well as managing the transactions conducted

16  through various companies referenced above.

17       According to IRS filings, Future Growers, LLC, listed

18  defendant's brother as a 90 percent owner of this company, while

19  defendant's accountant was 10 percent owner.  (Ex. 4, Declaration of

20  Ashley J. Braver (hereinafter, "Braver Declaration") ¶ 2.a.)

21  However, Individual A testified that s/he never allowed his/her name

22  to be used in connection with this company, never played a role in

23  this company, and never authorized anyone to sign its operating

24  agreement for Individual A.  (Ex. 1 at USAO_0144997-USAO_0145001.)

25  IRS Filings also indicated that Future Growers, LLC owned 100 percent

26  of Duarte Development 15, LLC, (Braver Declaration ¶ 2.b.); however,

27  Individual A testified that s/he did not know s/he had ownership in

28  this company.  (Ex. 1 at USAO_0145002-USAO_0145003.)  Individual A

knew his/her name was on three companies because s/he was asked to sign paperwork and checks but s/he did not know which companies.

IRS filings also indicated that Individual B owned 90 percent of Lone Pine Investors Group, LLC with Individual A owning the remaining 10 percent.  (Braver Declaration ¶ 2.c.)  IRS filings indicate that Lone Pine owned 70 percent of Opportunity Fund A, LLC in 2014 and owned all of that company in 2015.  (Id. ¶ 2.d.)  Individual A testified that s/he was not involved in these companies and did not know s/he had any ownership in them.  (Ex. 1 at USAO_0145002-USAO_0145004.)

**False Statements in Bankruptcy**

On or about April 14, 2015, in Los Angeles County, within the Central District of California, defendant filed and caused to be filed a bankruptcy petition under Title 11, United States Code, namely bankruptcy case number 1:15-bk-11292-MT, entitled In re Mark Handel, in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Case").

On or about April 14, 2015, in Los Angeles County, defendant knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11, United States Code, namely, the Bankruptcy Case, by submitting and declaring under penalty of perjury to be true a Statement of Financial Affairs, which represented that defendant had no "gross amount of income" from "employment, trade, or profession, or from operation of [defendant's] business, including part-time activities either as an employee or in independent trade or business" from 2013 to the time of filing.  In

4

fact, as defendant knew, he had received substantial income from employment or operation of a business for these periods, income he received through his company, DTMM.  Specifically, from January 2013 through April 14, 2015, defendant earned approximately $2,263,221 in income in connection with his work as a real estate developer, which he intentionally did not disclose during the Bankruptcy Case.  To conceal that income, defendant, with the assistance of his accountant and others, disguised his income from companies and entities, including Investor Capital Group, Lone Pine Investors Group, LLC, Lone Pine Investors Group 2, LLC, Duarte Development 15, LLC, 2013 Opportunity Fund A, LLC, and Future Growers, LLC.

Defendant's false statements concerning his income and employment were material to the activities or decisions of the bankruptcy trustee and defendant's creditors; that is, they had a natural tendency to influence, or were capable of influencing, the decisions of the bankruptcy trustee and defendant's creditors.

In connection with the Bankruptcy Case, defendant intentionally concealed assets from the bankruptcy trustee and his creditors, including defendant's interest in the real property located at the intersection of Comcast Place and North Canyons Parkway in Livermore, California, namely, Assessor Parcel Number 905-0010-006, described more particularly as Parcel 3, Parcel Map 5112, filed September 29, 1987, in Book 172, Pages 11 through 14, inclusive, of Maps, Alameda County.[4]

---

[4] According to the Court's Preliminary Order of Forfeiture, this property was subsequently sold for $3,545,712.44, which represented the net proceeds of the sale of this property. (Dkt. 113.)  As the Stipulation Re Use of Proceeds From Interlocutory Sale of Real Property makes clear, defendant

*(footnote cont'd on next page)*

On May 21, 2015, during the first meeting of creditors in connection with the Bankruptcy Case, defendant testified under oath that he had not had personal income since 2008 and that all of his personal expenses were paid through DTMM, which he described as his wife's company.  Defendant also averred that DTMM was funded through loans from Individual A and Individual B.  Defendant said he facilitated real estate transactions without payment because Individual B loaned DTMM money.

On August 19, 2016, defendant signed and filed the Disclosure Statement Describing Debtor's Second Amended Chapter 11 Plan of Reorganization in which he stated that he had been unemployed for years.

### Subscribing to a False Tax Return

On or about October 13, 2016, in Los Angeles County, defendant caused his and his wife's United States Individual Income Tax Return, (Form 1040) for 2015 to be filed electronically with the IRS.  Prior to doing so, defendant had authorized his tax preparer to file his return electronically for him with the IRS.  Defendant willfully signed and subscribed to this tax return, which contained a written declaration that it was being signed under the penalty of perjury and which defendant knew contained materially false information, namely, he knew the return failed to disclose approximately $1,096,175 in additional income.  Defendant understood that the false and fraudulent income information provided by defendant was material in

---

engaged in transactions related to this property after he learned from the FBI in July 2018 that it may be investigating him for bankruptcy fraud.  (Dkt. 79 (describing real estate transactions occurring in 2019); Dkt. 72 at 12-13, n.8 (describing when the FBI informed defendant of its knowledge of his alleged bankruptcy fraud during July 2018 interview).)

that it affected the IRS's calculation of the amount of income earned and prevented the IRS from verifying the accuracy of the amount of tax claimed to be owed on defendant's return.  Defendant acted willfully in that defendant knew that the law required him to report all income accurately.  Defendant voluntarily and intentionally violated that duty.

For calendar years 2010 to 2017, defendant failed to report a total of approximately $6,886,877 of income on his Forms 1040, consisting of the following: $624,676 (2010); $1,025,148 (2011); $558,652 (2012); $1,074,062 (2013); $909,049 (2014); $1,096,175 (2015); $978,095 (2016); and $621,020 (2017).

As a result of defendant's conduct, the net operating loss associated with defendant's 2017 Form 1040 is reduced to $333,071, compared to $7,259,119 that is reported on the 2017 Form 1040.  Thus, the net operating loss deduction is disallowed for the tax year 2018. As a result of the net operating loss being disallowed in the 2018 tax year, defendant underreported his income by $1,411,050 and therefore failed to pay $460,408 in additional tax.

**III. PROCEDURAL HISTORY**

On December 9, 2020, a federal grand jury returned a nine-count indictment charging defendant with False Statements in Bankruptcy, in violation of 18 U.S.C. §§ 152(3), 2(b); Concealment of Assets in Bankruptcy, in violation of 18 U.S.C. §§ 152(1), 2(b); False Statements Under Oath, in violation of 18 U.S.C. §§ 152(2), 2(b); and Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 2(a).

On February 6, 2023, the government filed the First Superseding Information charging defendant with False Statements in Bankruptcy,

in violation of 18 U.S.C. § 152(3), 2(b), and one count of Subscribing to a False Tax Return, in violation of 26 U.S.C. § 7206(1).  On the same date, the government filed a plea agreement in which defendant agreed to, among other things, forfeit his interest in $3,545,712.44 and to pay all the taxes and penalties he owed for tax years 2010, 2012, 2013, 2015, 2017, and 2018.

On February 13, 2022, defendant appeared at a hearing to change his plea to guilty to the two-count First Superseding Information pursuant to a plea agreement, but, due to uncertainty concerning defendant's restitution obligations, this Court took the matter off calendar.  (Dkt. 102.)  On February 23, 2023, defendant entered his plea of guilty to both counts of the First Superseding Information.  (Dkt. 107.)

On April 26, 2023, upon application by the government, this Court entered a preliminary order of forfeiture in the amount of $3,545,712.44 with the order to become final as to defendant at sentencing.

## IV.  ARGUMENT

### A.  <u>The Guidelines Calculation</u>: Defendant's Total Offense Level Is 22, and His Guidelines Range Is 41 to 51 Months

1.  <u>The Parties Agreed Upon Sentencing Guidelines Factors</u>

Pursuant to the terms of the plea agreement, the government and defendant agreed to the following applicable Sentencing Guidelines factors:

<u>**Count One:**</u>

Base Offense Level            6    [U.S.S.G. § 2B1.1(a)(2)]

*Specific Offense Characteristics*

- Loss over $1.5 million          +16   [U.S.S.G. § 2B1.1(b)(1)(I)]

- Misrepresentation during        +2    [U.S.S.G. § 2B1.1(b)(9)(B)]
  Bankruptcy

**Count Two:**

Base Offense Level                18    [U.S.S.G. § 2T1.1(a)(1);
                                         U.S.S.G. § 2T4.1(G)][5]

The parties reserved the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate. The government specifically highlighted in the plea agreement that it would be arguing that a sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C) applies to defendant's bankruptcy crime and that a sophisticated means enhancement under U.S.S.G. § 2T1.1(b)(2) applies to defendant's tax crime. The government also reserved the right to argue that a one or two-level multi-count adjustment applies pursuant to U.S.S.G. §§ 3D1.4(a) and (b).

---

[5] The base offense level for defendant's false subscription charge can be calculated by taking 28 percent of unreported gross income plus 100 percent of any false credits claimed against the tax, <u>unless</u> a more accurate determination of the loss can be made. U.S.S.G. §§ 2T4.1, 2T1.1(c)(1)(A), Note (A) (emphasis added). While the USPO is correct that 28 percent of the unreported income in this case exceeds $1.5 million, (PSR ¶ 49), the government and defendant believe a more accurate determination of the tax loss can be made here based on defendant's unreported income in tax year 2018 when defendant's net operating loss was disallowed. Defendant underreported $1,411,050 in income that year, which meant he owed $460,408 in taxes. The government and defendant believe this is an accurate determination of defendant's tax loss, which is approximately 33 percent, not 28 percent, of the unreported $1,411,050 in income. The government requests that the Court honor the parties' agreement to calculate the base offense level for Count Two based on the figures contained in the plea agreement. Defendant should receive the benefit of his bargain. (If the government stated during its call with USPO that the base offense level was based on 28 percent of the underreported income from the 2015 tax year, then the government misspoke and apologizes for the error.)

2.   <u>Sophisticated Means Under U.S.S.G. § 2B1.1(b)(10)(C)</u>

The USPO concluded that defendant's offense level for his bankruptcy fraud should be increased by two levels because "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  The USPO reasoned that defendant concealed his employment income as a real estate developer through companies purportedly owned by Individual A and Individual B and through payments characterized as "loans' from Individual A and Individual B paid to DTMM, a company purportedly owned by defendant's wife, warranting the adjustment.  (PSR ¶¶ 42-43.)

The government agrees with the USPO.  The notes of U.S.S.G. § 2B1.1 further support USPO's conclusion, as it defines "sophisticated means" to be "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense . . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

Defendant's conduct here is the very definition of sophisticated means.  As discussed above, defendant and his accountant and co-conspirator, Individual B, created a labyrinth-like structure with multiple pass-through entities to conceal defendant's income from his creditors, the bankruptcy court, and the IRS, as the following chart demonstrates:

| Entity | Ownership (Tax Years) |
|---|---|
| Future Growers, LLC | Individual A 90% and Individual B 10% (2014 & 2015) |

| Entity | Ownership (Tax Years) |
|--------|----------------------|
| Duarte Development 15, LLC | Future Growers, LLC 100% (2014) |
| Lone Pine Investors Group, LLC | Individual A 10% and Individual B 90% (2014 & 2015) |
| 2013 Opportunity Fund A LLC | Lone Pine Investors Group, LLC 70% (2014); Lone Pine Investors Group, LLC 100% (2015) |

(Braver Declaration ¶ 2.a.-2.d.)  Despite IRS filings indicating that Individual A and Individual B owned these entities, as discussed above, Individual A said he had nothing to do with the entities and had no idea he had ownership in them.  Indeed, Individual A testified that if his/her name was on paperwork associated with this company and others, Individual A "believe[d] that it was used to conceal [defendant's] interest in them."  (Ex. 1 at USAO_0145003.)  That is consistent with what Individual B's employee told investigators when she identified the entities listed above as being defendant's companies.[6]  (Ex. 5 at USAO_0028473-USAO_0028475.)  Further, defendant admitted in his plea agreement that he "conceal[ed]" approximately $2,263,221 in income he earned from January 2013 through April 2014 in connection with his work as a real estate developer.  (Dkt. 100 at p. 13.)  Defendant also admitted that to conceal that income, defendant, his accountant (Individual B), and others disguised the income from "companies and entities, including . . . Lone Pine Investors Group, LLC,. . . Duarte Development 15, LLC, 2013 Opportunity Fund A LLC, and Future Growers, LLC."  (Id.)  By

---

[6] Individual C, a real estate agent that had worked with defendant, testified that he thought Duarte Development was owned by Individual B and defendant's wife, though he indicated he had no idea why it was in her name instead of defendant's and that defendant's wife had no real estate development experience.  (Ex. 6 at USAO_0106838-USAO_0106839.)

1  defendant's own admission, that income was paid to a company he

2  formed in his wife's name, DTMM, (id.), which, as Individual A

3  testified to and defendant's business partner confirmed, means "Don't

4  Touch My Money" (Ex. 1 at USAO_0144990 and Ex. 2 at USAO_0028770).

5  Finally, defendant admitted he had "disguised" the income received

6  from these various entities to conceal his assets from the bankruptcy

7  court and his creditors.  (Dkt. 100 p. 13.)

8       Defendant used pass-through entities to conceal his income and

9  defraud the bankruptcy court and his creditors.  Taken together, this

10  evidence supports the application of the sophisticated means

11  enhancement here.  See United States v. Pacheco-Martinez, 791 F.3d

12  171, 179 (1st Cir. 2015) (affirming application of the sophisticated

13  means enhancement where the defendant "set up multiple corporate

14  entities in order to facilitate his fraudulent schemes"); United

15  States v. McKye, 638 F. App'x 680, 685 (10th Cir. 2015) (holding

16  district court did not plainly error in applying sophisticated means

17  enhancement where, among other things, defendant "use[d] multiple

18  entities to coordinate the fraud").  Accordingly, defendant's

19  adjusted offense level for the bankruptcy fraud offense should be 26.

20  (See PSR ¶ 47.)

21           3.   Sophisticated Means Under U.S.S.G. § 2T1.1(b)(2)

22       The USPO also concluded that the Court should apply the

23  sophisticated means enhancement for defendant's tax crime.  The USPO

24  correctly reasoned that defendant's concealment of income using

25  several companies in the names of his wife and Individual A and

26  characterizing income as "loans" from Individual A and Individual B

27  constituted sophisticated means.

28

1    The government again agrees with USPO's conclusion.  The notes

2    to U.S.S.G. § 2T1.1(b)(2) define "sophisticated means" to be

3    "especially complex or especially intricate offense conduct

4    pertaining to the execution or concealment of an offense. . . .

5    Conduct such as hiding assets or transactions, or both, through the

6    use of fictitious entities, corporate shells, or offshore financial

7    accounts ordinarily indicates sophisticated means."  Here, the same

8    pass-through entities defendant used to conceal his income from the

9    bankruptcy court and his creditors, he used to defraud the IRS and

10   for many more years.  Accordingly, for the same reasons, the

11   sophisticated means enhancement applies under U.S.S.G. § 2T1.1(b).

12   See United States v. Lewis, 93 F.3d 1075, 1082 (2d Cir. 1996)

13   (district court should have applied the specific offense

14   characteristic where, among other things, the scheme "used numerous

15   fictitious entities and multiple checks with the sole purpose of

16   evading taxes and avoiding IRS detection").  Accordingly, defendant's

17   adjusted offense level for the tax fraud offense should be 20.

18        4.   Multi-Count Adjustment Under U.S.S.G. § 3D1.4

19   The USPO concluded that the bankruptcy fraud conduct and tax

20   fraud conduct do not group and applied a two-level upward adjustment

21   to defendant's bankruptcy fraud offense, bringing the combined

22   adjusted offense level to 28. (PSR ¶¶ 57-59.)

23   The USPO is correct that defendant's bankruptcy fraud and tax

24   fraud offenses do not group under U.S.S.G. § 3D1.2.  See United

25   States v. Doxie, 813 F.3d 1340, 1345 (11th Cir. 2016) (holding that

26   district court did not err in refusing to group tax offense counts

27   with mail fraud counts and observing that "majority of circuits to

28   address this issue have concluded that fraud counts and tax offense

counts involving the proceeds of the fraud should not be group together"); United States v. Smith, 424 F.3d 992, 1015 (9th Cir. 2005) (affirming decision not to group tax counts with mail fraud, wire fraud, and money laundering counts because victim of the former was the United States government whereas victims of the latter were the clients who had their money stolen by defendants).  Here, defendant's crimes harmed two different types of victims. Defendant's bankruptcy fraud harmed creditors while his tax fraud harmed the United States.  Given the differences in defendant's victims and the offense behavior, these two offenses should not group.  Taken together, USPO's conclusion was correct, and these offenses do not group under U.S.S.G. § 3D1.4.  Because the offenses do not group and the difference between defendant's bankruptcy fraud adjusted offense level and the tax fraud adjusted offense level is six, defendant's adjusted offense level for his bankruptcy fraud offense (the highest adjusted offense level) should be increased by one level, making it 27.

> 5.   Defendant's Guidelines Range Is 41 to 51 Months' Imprisonment

The government concurs that defendant falls in criminal history category I and that after the new Sentencing Guidelines take effect on November 1, 2023, defendant will be considered a zero-point offender under U.S.S.G. § 4C1.1 and should receive a two-level reduction.  Finally, consistent with the plea agreement, assuming defendant continues to demonstrate acceptance of responsibility through sentencing, the government agrees that he should receive a three-level reduction pursuant to U.S.S.G. § 3E1.1, which combined with the zero-point offender reduction brings defendant's total

offense level down to 22.  Based on a total offense level of 22 and a criminal history category I, defendant's Guidelines Range is 41 months to 51 months' imprisonment.

>    **B.**    **<u>The Government's Recommendation</u>: A Sentence of 51 Months' Imprisonment and a Fine of $20,000 Is Necessary to Punish and Deter**

In determining a sufficient sentence, courts must consider the nature, circumstances, and seriousness of the offense.  18 U.S.C. § 3553(a).  So too must courts weigh the need for a sentence to afford adequate deterrence, just punishment, and promote respect for the law.  <u>Id.</u>  Given careful consideration of all these factors as well as the other Section 3553 factors, the government respectfully requests a sentence of 51 months' imprisonment and a fine of $20,000.  Such a sentence is sufficient, but not greater than necessary, to adequately punish and deter.

>    **1.**    <u>A Significant Sentence Imposed Must Punish Defendant for His Egregious Conduct</u>

Given the nature, circumstances, and seriousness of the offense, a substantial sentence is imperative.  Defendant's crimes were not born out of desperation, nor done on a whim without much thought.  His crimes required planning, calculation, and an almost insatiable drive to break the law time and time again.  Indeed, given the brazenness of his conduct, including bragging to others that his company stood for "Don't Touch My Money," defendant believed he was above the law.  And when he found out during his FBI interview in July 2018 the government may have caught on to his fraud scheme and that he may not actually be above the law, he sought to hide his

fraudulently procured assets in the form of the Livermore property transfers discussed above.

Not only were defendant's crimes ongoing and persistent, their scope was significant, involving millions of dollars.  As discussed above, defendant concealed $2,263,221 in income he earned from January 2013 through April 14, 2015 from the bankruptcy court and his creditors.  Even more egregious was defendant's tax fraud, as he succeeded for a number of years in not reporting approximately $6,886,877.

Even though defendant pled guilty to bankruptcy and tax fraud, his crime is not without victims.  One of those victims was D.S., who had to litigate with defendant to recover his settlement with defendant, who sought the protection of bankruptcy court with lies and fraud.[7]  Further, the government and the other taxpayers are victims here, including the majority of taxpayers that comply with the tax laws.

      2.   <u>Defendant Needs a Significant Sentence to Deter Both Him and Others From Engaging in the Same Conduct</u>

Although defendant is 69-years-old and has no other criminal history, he does not deserve a free pass for his misdeeds.  The scope, length, and ease with which defendant executed his crimes militate in favor of a significant custodial sentence to send the message to him and others that this type of criminal activity, particularly criminal activity this egregious, has significant consequences.  As for specific deterrence, even after being alerted

---

[7] Defense counsel has been provided a copy of the letter that we understood was sent to the Court by D.S. earlier this year.  If the Court no longer has a copy, the government will be happy to provide D.S.'s letter.

that the government was investigating him, defendant took actions to conceal his Livermore assets.  Further, given defendant's refusal to fully comply with this Court's General Order 03-01 mandating certain financial disclosures to the Court and USPO, including those discussing his businesses, (PSR ¶ 105),[8] the government still has concerns about what defendant is hiding.  Indeed, as the USPO found, defendant "has substantial financial resources," including maintaining two residences and providing financial support to two adult children, (PSR 112), but yet he has not one, but two Court-appointed attorneys.  Nevertheless, at this point, the government is unaware of additional assets that defendant has concealed.  Still, defendant's refusal to comply with a mandated court order raises serious questions about his respect for the law and willingness to rejoin society as a law-abiding citizen.

As for general deterrence, it is particularly important to send the message to the public writ large that tax fraud and bankruptcy fraud have serious consequences, regardless of how old you are and whether you have previously engaged in misconduct.  White-collar crime is still crime, and it just as deserving of deterrence – if not more – than other forms of illegality.  Otherwise, the Court will be sending a message that criminals like defendant only risk receiving slaps on the wrist when they steal and hide millions of dollars. What is more, it is impossible to police all who may decide to engage in such fraud, which is why it is particularly important to make clear that those who are caught engaging in such fraud will face serious consequences, including significant custodial sentences.

---

[8] Defendant told the USPO that he would not be providing that information on the advice of counsel.

17

### 3.    The Court Should Impose a Fine of $20,000

In addition to the custodial sentence discussed above, the Court should order defendant to pay a fine of $20,000.  The Guidelines state that the Court "shall impose a fine in all cases, except where the defendant establishes that [s]he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  The government concurs with the PSR that defendant is able to pay a fine of $20,000.  Such a fine is necessary to promote respect for the law and afford deterrence.

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 51 months' imprisonment, a three-year term of supervised release, and order defendant to pay a fine of $20,000.  Such a sentence would be sufficient, but not greater than necessary, to adequately punish and deter.  Anything less would be unjustified and far too lenient given the seriousness of defendant's crimes and the strong need for specific and general deterrence.