MARK WINDSOR (SBN 190589)
Law Office of Mark Windsor
65 N. Raymond Ave., Ste. 320
Pasadena, California 91103
Telephone: (626) 792-6700
Email: mark@windsorlaw.us

Attorney for Defendant
MARK HANDEL

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 20-CR-612-ODW-1 |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM; EXHIBITS** |
| v. | Hearing Date: November 6, 2023 |
| | Time: 11:00 a.m. |
| | Department: 5D |
| MARK HANDEL, | |
| Defendant. | |

Mark Handel, by and through counsel, here files his memorandum regarding sentencing factors.

DATED: October 23, 2023                    Respectfully submitted,

                                           _____/s/_____
                                           MARK WINDSOR
                                           Attorney for Defendant Handel

## I. __INTRODUCTION__

For approximately 30 years, Mark Handel has been a real estate developer first in New York City and then back at home in Southern California, and for much of that time he was extremely successful. But Mr. Handel was constantly developing multiple new projects simultaneously, and rolling his profits back into the business, with no savings or reserve. He was wealthy, but eternally cash poor. When the real estate market crashed, along with large swaths of the general economy in 2008, Mr. Handel was totally exposed. He had a company with about 70 employees that ran on a constant inflow of credit, and suddenly that lifeblood stopped flowing.

Mr. Handel spent the next several years working with his creditors to try to settle his debts and remain in the real estate development business, and with the help of investor Jack Benadon, he was largely successful. For instance, Mr. Handel succeeded in delaying payment of a $7 million loan to Alliance Bank, so that he could develop and sell the property involved and settle the debt for whatever it sold for. Unfortunately, Alliance Bank fell victim to the economic downturn and was shuttered in February of 2009, and California Bank and Trust (CBT) bought $1.12 billion of the failed bank's assets (including Mr. Handel's loan, which had now ballooned to $7 million) for $9.9 million. *See* Exhibit A. CBT was in no mood to cut deals and wait around for land to be developed.

CBT's lawyers proceeded to obtain a judgement in California Superior Court for repayment of the debt and embarked on an aggressive campaign of sweeping every bank account even remotely associated with Mr. Handel. They went so far as to sweep the

funds from his wife's LAUSD individual retirement account, and the Homeowners Association for the condominium they owned in Wisconsin had to hire legal assistance to prevent CBT's lawyers from seizing their accounts because Mr. Handel was the secretary/treasurer of the Association. Worst of all, CBT lawyers sent process servers to the schools of Mark Handel's ten-year-old twins, his thirteen-year-old son and seventeen-year-old daughter to serve them with subpoenas to a "deposition of creditors."

In the face of this harassment, Mark Handel resolved to file bankruptcy to thwart what he saw as the rapacious greed of the law firm hired by CBT, who were seemingly quite content to go on billing hours endlessly and grinding Mr. Handel into dust, despite his several attempts to reach settlement. Outraged and indignant, wise to the aggressive tactics used against him, and determined to keep CBT's lawyers from seizing what remained of his assets, Mr. Handel took no money directly for his continuing work on development projects, but rather took his payments characterized as loans and kept the funds out of any account bearing his name. In so doing he made false statements regarding his income to his creditors during a Bankruptcy proceeding and underreported his income to the Internal Revenue Service. These acts form the basis of his tax and false statement crimes.

Accordingly, Mr. Handel has pled guilty pursuant to a plea agreement to one count of violating 18 U.S.C. § 152(3) (False Statement in Bankruptcy) and one count of violating 26 U.S.C. § 7206(1) (Subscribing to False Tax Return) for his 2015 tax return. Through this agreement the parties stipulate that the loss amounts for each count of conviction result in a guidelines offense level for Count 1 of 24, and an offense level for

Count 2 of 18, with both parties free to argue additional Guidelines factors, and to argue for a sentence outside of any guidelines range determined by the Court. Mr. Handel has waived appeal of any sentence that is equal to or lower than 63 months, which is higher than the statutory maximum of the most serious offense (60 months).

Mr. Handel has forfeited $3,545,712.44 to the U.S. Government pursuant to the plea agreement, which was realized on April 26, 2023. In addition, Mr. Handel has paid $1,618,836.48 in restitution to the Internal Revenue Service, which covers his underpayment of taxes for the tax years of 2010, 2012, 2013, 2015, 2017, and 2018, as well as civil penalties and interest.

The Probation Officer, through the Presentence Report, has applied a sophisticated means enhancement of two levels to each count, calculated the loss for Count two based on all tax years that Mr. Handel paid back taxes for (a 4-level increase), added a 2-level multi-count adjustment, and ended up after reductions for acceptance and 0-point offender at an adjusted offense level of 23 and a Criminal History of Category I for Mr. Handel, and has made a low-end recommendation of 46 months.

We respectfully disagree with the calculations of the Presentence Report, as will be discussed in further detail below, and instead would group the offenses under 3D1.2(d) with an offense level of 24 and an adjusted offense level, after reductions for acceptance and 0-pt Offender, of 19. At Criminal History I, the range is 30-37 months, though we will urge the Court to impose a sentence well outside of the guidelines range, in light of the nature and circumstances of the offense, the history and characteristics of Mr. Handel, and the other factors set forth in 18 U.S.C. § 3553(a). We believe that the

age of Mr. Handel, his personal history and character, as well as the context the crime and nature of the damages in this case warrant a consideration of whether it is necessary to confine Mr. Handel to prison for any length of time at all, rather than impose a probationary sentence with the recommended fine and such conditions as community service or house arrest as the Court sees fit. In the event this Court determines that justice requires prison for Mr. Handel, we will ask the Court to impose a sentence of one year and one day.

## II. GUIDELINES CALCULATIONS

We have submitted informal objections to the probation officer regarding the U.S.S.G. calculations in the PSR and are awaiting a response. When Probation has had an opportunity to respond to these objections, Mr. Handel will request leave to file a supplement to this sentencing memo and to address what remains of our disagreements.

## III. 18 U.S.C. § 3553(a) SENTENCING FACTORS
### A. The Nature and Circumstances of the Offense

In April 2015, Mr. Handel was forced to file Chapter 11 bankruptcy after two of his creditors, CBT and Sunnyside, refused to settle with him in satisfaction of outstanding debts.  Ultimately, after extensive investigation by these creditors and open admissions by Mr. Handel during the proceedings, the two creditors agreed to settle their claims with Mr. Handel under extremely favorable terms for both CBT and Sunnyside.

The CBT debt, originally owned by Alliance Bank, was acquired by CBT in 2009 after CBT bought roughly $1.2 billion in total assets from Alliance at a steeply

discounted price of $9.9 million.  By the time of Mr. Handel's bankruptcy filing, he owed CBT, under the terms of his agreement with Alliance, approximately $10 million, which extrapolates to roughly $82,500 that CBT would have paid to Alliance to acquire a debt of this amount.  Prior to the bankruptcy filing, CBT's counsel (the Buchalter law firm) began a relentlessly exhaustive and thorough investigation into Mr. Handel's financial status to uncover what they believed to be "hidden" assets.  In doing so, they drafted and served numerous subpoenas on every person associated with Mr. Handel, including subpoenaing Mr. Handel's children at their respective schools.  As touched upon above, Buchalter also swept and attempted to sweep every account they could locate that was at all associated with Mr. Handel, which included Mr. Handel's wife's retirement account that was under her name only and the Homeowner's Association account on which he was one of several signatories.  They left no stone unturned in their expansive vetting of Mr. Handel's current and past finances.  After Mr. Handel declared bankruptcy, Buchalter/CBT filed a non-dischargeability complaint alleging fraud.  After their vigorous investigation into all of Mr. Handel's finances and individuals associated with Mr. Handel, including full knowledge of the money that Mr. Handel called loans but which were really payments for his work as a consultant (which had been spent by the time of the bankruptcy filing in any event) they ultimately stipulated to a settlement wherein Mr. Handel would pay them $3.2 million in installments.  Considering CBT spent only $82,500 to purchase Mr. Handel's debt to Alliance, CBT still came out on top by over $3 million.

In contrast to CBT, Mr. Handel never borrowed money from Sunnyside. The Sunnyside debt came about when two brothers, Daniel and Joshua Sabah, sued Mr. Handel for losses after their real estate investment, which they'd bought from Mr. Handel, could not be built because the property purchased did not include the rights to the architectural drawings of the original project designers. Instead of hiring their own architects to make minor changes to the original drawings, the Sabah brothers sued Mr. Handel to try to recoup the monetary losses. The brothers agreed to settle with Mr. Handel for $150,000. Mr. Handel ultimately could not pay the settlement amount, however, and ultimately filed for bankruptcy. In 2016, Mr. Handel and Sunnyside stipulated to a settlement for $300,000, which is double what the brothers would have received under the original settlement agreement.

Mr. Handel has satisfied all debts in bankruptcy, and his case is closed.

The tax conviction in this case involved the same conduct as that in the bankruptcy conviction – the mis-categorization of income as loans and underreporting of total income on Mr. Handel's 2015 tax return.

**B. The History and Characteristics of Mark Handel**

Both the Presentence Report and the Report of Psychologist Jeffrey Whiting provide detailed insights into Mr. Handel's background and personal history. Mr. Handel was raised by a father who escaped Europe during World War II while most members of his family were killed in the Holocaust. His father, Leo, also suffered from bipolar disorder, ADD and likely other mental illnesses in addition to the trauma of his wartime

experiences and the guilt of having escaped and survived when so many he knew well

had perished. Leo was physically and verbally abusive to Mr. Handel and would beat him

4 or 5 times a week when Mr. Handel was in grade school. When Mr. Handel was in his

early teens he began to fight back against his abusive father and to experiment with drugs

and began to have problems at school. It was then that his parents brought him to a

psychiatrist who diagnosed him with an unspecified personality disorder and

recommended he be sent to a school in Florida called the Green Valley School. This was

the worst thing his parents could have done, as it turned out. The school was later

revealed to be a source of life-long trauma for all of the students who were sent there.

The physical, emotional, and other abuses suffered by Mr. Handel at the hands of the

staff and other students there are well documented in the PSR and psychological report.

According to Dr. Whiting, the experience left Mr. Handel "deeply injured."

> Childhood victims of this type of multiple trauma events/situations, either
> completely collapse into a pernicious, dark, self-destructive depression, or they
> form a hard shell around them, and proceed as if nothing can penetrate that shell.
> They have a seething resentment percolating beneath the defensive veneer toward
> anyone who attempts to subvert their will or treat them unfairly.  This response,
> which is powerful, flows directly from what he suffered.  He was forced to do and
> experience unspeakable things that he desperately wanted to resist, but could
> not…. The sometimes harsh, brittle, angry, and sometimes illogical and unwise,
> decision-making, is a protective mechanism.  They are vulnerable and respond as
> if their life is in danger, as it was experienced to be, during the original abuse.
> *See*, Whiting Report, p. 3-4.

This trauma therefore provides important context to Mr. Handel's reaction to the

aggressive tactics of CBT and their refusal to agree to terms that Mr. Handel could meet,

above and beyond what any of us would feel were our young children humiliated at

1   school by an order that they appear to be questioned by hostile strangers because their

2   father is a debtor.

3        Yet other aspects of Mr. Handel's personality, like his ADD, made real estate

4   development - where one must locate land with potential, then convince a bank or

5   investor of the potential, then convince a local government to allow them to realize this

6   potential, and then get the approved project actually completed – a perfect fit. "The

7   constant pressures and multitasking were an antidote to his natural tendency to gravitate

8   toward features of life that were in constant motion, rapidly changing, and stimulating.

9   He thrived…  Having little patience made him extremely successful; he constantly moved

10  projects toward the finish line.  His ADD influenced tunnel vision allowed him to ignore

11  extraneous details so he could charge toward achieving a finished product." Id., p. 5

12       Mr. Handel also has an extremely close and loving family despite his early

13  struggles and lasting trauma and is still admired and respected by many friends and

14  business associates in spite of the very public prosecution and guilty plea in this case.

15  Some of Mr. Handel's former lenders have written on his behalf as well as a successful

16  real estate developer that got his start through Mr. Handel. James Rothstein, founder of

17  the real estate finance company Lone Oak Fund, has worked with Mr. Handel for 30

18  years, loaning Mr. Handel a total of about $50 million during that time. He describes how

19  Mr. Handel dealt with his company during the crisis of 2008-2009, how Mr. Handle

20  never shirked his responsibility and came through in the end. "Lone Oak has made over

21  7,000 real estate loans, and one only gets to see a borrower's true nature when problems

22  arise. Mark's true nature, displayed in a time of crisis, was without question of the

highest order and integrity." This no doubt explains how Mr. Handel was able to reach agreement with almost all of his creditors and was almost able to avoid bankruptcy, and possibly this indictment, altogether.

## II.   **CONCLUSION**

Mr. Handel is 69 years old, and despite an extremely challenging start and early struggles, he has led an extremely productive life, providing thousands of homes through tireless work navigating local governments, lenders, community protesters, and construction trade unions – often all at the same time. And he has provided these homes to a state and region desperately in need of them. There likely aren't many people who can successfully complete these types of projects for as long as Mr. Handel has managed to. Regrettably, due to his actions in this case, he may well be relegated to minor advisory roles in any future projects, if he can find the work at all. He has lost his standing in the real estate and local political community to significant degree if not entirely. He has paid millions and has done so quickly to atone for his conduct, and he has finally discussed and faced his lifelong trauma and begun the healing process. But this is only the beginning of the process. As Dr. Whiting has pointed out, Mr. Handel "desperately requires treatment… If he is sentenced to custody, that therapy, so crucial for him to recover from his traumatic past, and improve the remainder of his life, will be interrupted."

At his age and stage in life, prison for Mr. Handel is likely to be far more difficult and punitive than it would be for younger offenders with fewer attachments and responsibilities. His age also makes it extremely unlikely that Mr. Handel will reoffend.

In weighing the proper sentence it may also make sense to consider the nature of the two victims of Mr. Handel's crimes – a large bank that made millions in profits from the very bankruptcy proceeding that Mr. Handel is being punished for, and the United States Government. These crimes are indeed serious, but they do not involve vulnerable victims, and Mr. Handel's crime in this case does not establish him as a continuing threat to the community that would require he be forcibly removed from it and walled off from family and friends.

The only goal of sentencing that would be served by a prison sentence for Mr. Handel would be punishment. As James Rothstein has observed, "please know that Mark has suffered an enormous amount from the time of his indictment and continuing now. As a result of the indictment, he was forced to sell his house, has moved four times since 2019 and for long periods of time was virtually destitute while he tried to earn money to provide for his family." We respectfully suggest that a prison sentence is not necessary in this case, and in the event this Court in its wisdom disagrees, we ask for a sentence of no more than one year and one day.

DATED: October 24, 2023                     Respectfully submitted,

                                            _____
                                                     /s/
                                            MARK WINDSOR
                                            Attorney for Defendant Mark Handel

# LOS ANGELES BUSINESS JOURNAL

### THE COMMUNITY OF BUSINESS™

(/)

EXHIBIT A

Lists (/lalists/)

Health Care (/news/healthcare/)

Real Estate (/news/real-estate/)

Finance (/news/finance/)

Manufacturing (/news/manufacturing/)

Tech (/news/technology/)

Infrastructure (/news/government/)

Travel/Leisure (/news/travel-leisure/)

Media (/news/media-entertainment/)

Professional Services (/news/services/)

Events (/bizevents/2019/)

Custom Features (/supplements/)




# Regulators Seize and Sell Culver City Bank

By Los Angeles Business Journal

 Friday, February 6, 2009

Regulators seized Alliance Bancshares California late Friday and transferred the deposits of the beleaguered Culver City business bank to a San Diego institution.

The California Department of Financial Institutions shut down Alliance and appointed the Federal Deposit

Insurance Corp. as receiver, which entered into a purchase and assumption agreement with California Bank & Trust of San Diego.

Alliance's five Los Angeles area branches will reopen Monday morning as branches of California Bank & Trust. Deposits of Alliance will be automatically transferred to the new institution and Alliance customers will have full access to their accounts, the FDIC said. Alliance executives did not respond to an interview request.

Alliance, the holding company for Alliance Bank, had assets of $1.14 billion and deposits of $951 million as of Dec. 31.

In addition to assuming all of Alliance's deposits, California Bank & Trust will buy $1.12 billion of the failed bank's assets for $9.9 million. The FDIC will keep the remaining assets for later sale.

The failure of Alliance was not unexpected. Burdened by souring construction loans, particularly loans for single family homes and tract projects, Alliance was deemed "under-capitalized" in September and was subsequently issued a cease and desist order by regulators directing the bank to shore up its dwindling capital levels.

Then in November, Alliance said it was facing receivership if it could not raise capital either through the sale of securities or through a merger with another institution.

Founded in 1979, the bank struggled in its first few years. Chief Executive Curtis Reis, who joined the bank in 1986 after two decades in the Los Angeles banking industry, helped guide the bank to profitability by focusing on lending to small and mid-sized businesses, particularly those that are run by immigrants.

Alliance is the eighth bank to fail this year and the second Southern California institution to be seized in the past two weeks. On Jan. 23, Redlands-based 1st Centennial Bank was closed and its insured deposits were assumed by First California Bank, headquartered in Westlake Village.

The FDIC estimates that the failure of Alliance will cost its insurance fund $206 million.

The fund took a considerable hit in 2008 as 25 U.S. banks and thrifts failed, including several high-profile meltdowns such as Pasadena-based IndyMac Bank and Seattle-based Washington Mutual. Earlier this week, the FDIC said its insurance fund could endure losses of more than $40 billion in the next few years as more banks succumb in the deteriorating economy.

As of Sept. 30, the FDIC had 171 institutions on its list of troubled institutions.

For reprint and licensing requests for this article, CLICK HERE (https://info.wrightsmedia.com/labj-licensing-reprints-request-0?magazine_name=Los%20Angeles%20Business%20Journal).

## Stories You May Also Be Interested In

Regulators Close First Regional Bank
(/news/2010/jan/29/regulators-close-first-regional-
bank/)

Regulators Seize First Bank of Beverly Hills
(/news/2009/apr/24/regulators-seize-first-bank-of-
beverly-hills/)

Alliance Bank Faces Receivership
(/news/2008/nov/20/alliance-bank-faces-
receivership/)

Growth Drive Carried Culver City Bank Over Cliff
(/news/2009/sep/21/growth-drive-carried-culver-city-
bank-over-cliff/)

Saehan Told to Strengthen Lending Practices,
Management (/news/2008/nov/13/saehan-told-to-
strengthen-lending-practices/)

Koreatown Bank Shuttered
(/news/2009/jun/27/koreatown-bank-shuttered/)

IndyMac Seized by Federal Regulators
(/news/2008/jul/11/indymac-seized-by-federal-
regulators/)

Regulators Close Security Pacific Bank
(/news/2008/nov/07/regulators-close-security-pacific-
bank/)

ON THE **MOVE** PEOPLE
(/people-on-the-move/)

# EXHIBIT B
# LETTERS

Honorable Judge Wright,

Your honor, thank you for the opportunity to address you. As you are fully aware by now, I have put myself in a painful, costly and humiliating situation. I have engaged in criminal conduct, and in doing so, I have harmed my family and my standing in my community irreparably.
I have been a businessman for approximately 40 years, and have faced numerous trying and difficult circumstances during the course of my career. I was always able to solve those challenges, and I relied on my communications and interpersonal skills to do so. Recently, I encountered a circumstance with a financial adversary in which my skills failed me. In my hubris, and misplaced egotism, I resorted to criminal conduct in order to deal with my adversaries. I was confident that I could "bend the rules" in order to achieve my objective. I have now come to realize how misguided and wrong my behavior was, and as a result, I have destroyed my reputation, my families well-being, and I have harmed my adversaries. I am sorry and ashamed by my behavior , I will live with the pain of how unnecessary this was for my entire life. I  do not believe I can adequately express how sorry and pained I am, and the only silver lining is, I have learned an invaluable lesson going forward. I believe I have become, and I am confident that I will become a better person for this.

Thank you for your time and consideration.

Sincerely,

Mark Handel

Sarah J. Lulloff
5865 Woodglen Dr.
Agoura Hills, CA. 91301

Dear Judge Wright,

I am Mark Handel's wife of 31 years. I'm writing to give you further insight into our life and the crisis we faced after the real estate crash of 2008. Whatever happened to us does not excuse Mark's conduct; it is just something I feel I need to say and something, I feel, you need to be aware of.

We lost virtually everything in 2008, and Mark took it upon himself to try and keep us afloat in addition to dealing with all the creditors in what he thought was a fair and reasonable manner. Mark was advised, in 2009, to declare chapter 7 bankruptcy, and walk away from the approximately 250 to 300 million dollars that he owed to various creditors. However, Mark felt an allegiance to work with each and every creditor in an attempt to minimize their losses. He was successful with 95% of the creditors. Unfortunately, one creditor was not interested in settling and created an impossible situation for Mark and our family. This creditor was extremely adversarial.

Among the many things this creditor did, they improperly seized my individual retirement account from LAUSD Teaching. (Please note, the seized money was returned to me many years later.) Our Homeowners Association, where Mark was the secretary/treasurer, had to employ legal assistance to prevent the community's bank accounts from being seized by this creditor. And the most egregious thing was our ten year old twins, and our thirteen and seventeen year old children, were served with subpoenas for creditors' depositions. Mark finally put a stop to the harassment by declaring bankruptcy.

I am not sure what will happen to us, but Mark and all of us have paid a terrible price for something that me and my children cannot fully understand. Mark never makes excuses, and implores us to move forward. He puts on a brave face and masks how he is feeling, but one thing that is obvious to everyone is the circumstances of this journey have broken Mark and his spirit.

In light of what is taking place in the world around us, this letter seems very selfish, I apologize for that. Thank you for your time.

Sincerely,

Sarah J. Lulloff

11611 SAN VICENTE BOULEVARD
SUITE 640
LOS ANGELES, CA 90049

TELEPHONE 310 826 2888
FAX  310 820 9145
WWW.LONEOAKFUND.COM



**LONE OAK** FUND
CALIFORNIA'S BRIDGE LENDER

Honorable Otis D. Wright II
Judge, United States District Court
United States Courthouse
350 W. 1ˢᵗ Street
Los Angeles, California 90012

      Re:  United States of America v. Mark Handel
             2:20-CR-00612-1-ODW

Dear Judge Wright:

I have had the pleasure to call Mark Handel my friend and a valued client of my business, Lone Oak Fund, a real estate finance company with $1.3 billion under management, of which I am a founding principal. Lone Oak has been in business since 2003, and I have known and done business with Mark for all of those 20 years, plus 10 years prior to that.

I met Mark, when I was managing my law firm's pension fund, and he was developing small housing tracts in the San Fernando Valley. Mark was a regular borrower and became a great friend. Over the last 30 years, my estimation of Mark's borrowing topped $50 million. I find the situation that Mark is in odd, and his recent guilty plea to bankruptcy fraud inexplicable, considering my knowledge and history with Mark.

The real estate business has its ups and downs, and some of it does not come without problems, but dealing with those problems is what distinguishes Mark. In the immediate aftermath of the real estate melt-down of 2008-2009, Lone Oak had numerous loans that were no longer performing and required action on our part. Mark had one of those loans, but unlike many of our borrowers, Mark was immediately on the phone with us to apprise us of the situation and his plans for finding a solution. It took time, it was difficult, but Mark worked through it. Never once was there a flicker of shirking responsibility or an attempt to somehow create an atmosphere of shared blame on Lone Oak's part. That can be said for very few borrowers.

Lone Oak has made over 7,000 real estate loans, and one only gets to see a borrower's true nature when problems arise. Mark's true nature, displayed in a time of crisis, was without question of the highest order and integrity.

Mark and I have seen each other for lunch and dinner frequently over the last 30 years and frequently use each other as listening posts and offer our own best advice on situations we are facing. I know Mark lost upwards of $50 million after the 2008-2009

financial crises and had creditors in $100 million range. I know he contacted each and every one of them and worked out an acceptable financial solution with each one, except the very one that forced Mark into bankruptcy. So, whatever Mark did in that bankruptcy, and he clearly did something (hence his guilty plea), that is not the Mark Handel I know, nor is it the Mark Handel that the great majority of creditors that Mark dealt with knows. It is impossible to understand how Mark worked and worked to solve every debt crisis but failed with a lone creditor in such a manner that he ends up facing a prison term.

If I could humbly state, whatever sentence Mark receives, please know that Mark has suffered an enormous amount from the time of his indictment and continuing now. As a result of the indictment, he was forced to sell his house, has moved four times since 2019 and for long periods of time was virtually destitute while he tried to earn money to provide for his family. His wife went back to work (she is a school teacher), and his children have also made painful sacrifices. Mark has four children, all accomplished academically. One of his children was unable to attend an elite university because of the financial constraints the family has suffered. That was heartbreaking.

Mark's compassion and generosity is evident in his personal relationships. In my life, I had a painful and traumatic episode in my family. I was distraught and had great trouble dealing with it effectively. Mark had a personal history with the same type of problem, and he spent countless hours discussing, counseling, and generally directing me to a light at the end of the tunnel. He sought me out to spend time with me, pretty unique for a business associate. I'll always remember and always be appreciative of Mark. I truly believe, and I truly know, Mark is a good person. I hope this letter of support resonates with you.

Very truly yours,

James A. Rothstein



**ONYX**

CAPITAL CORPORATION

August 4, 2023

**The Hon. Otis D. Wright II,**
350 W. 1st St.
Los Angeles, CA 90012

RE: The matter of the United States of America v. Mark Handel 2:20-CR-00612-1-ODW

Your Honor,
Please allow me to express my opinion and knowledge in reference to my friendship, and more importantly, my business relationship with Mark Handel. Notwithstanding Mark's recent guilty plea to Bankruptcy fraud, my opinion based on a 20-year relationship is unwavering in my knowledge and belief of the extraordinary and positive manner in which Mark has conducted himself. I am the COO of Onyx Capital, and we are a financial services company based in El Segundo, Ca. I became the COO in 2018 upon the untimely death of the founder and my mentor, Bruce Tolchin. Bruce and Mark were dear friends and business associates for 30 years, and in my capacity as Bruce's second in command, I was a firsthand witness as to Mark's conduct in trying and difficult times. Mark borrowed approximately 20 million dollars from Bruce/Onyx. Much of this borrowing took place in difficult times for real estate developers, and Mark, although late, and frequently with numerous adjustments, never once failed to meet his debt obligations. Mark never took the opportunity to attempt to escape his obligations, and readily affirmed his obligations, even though much of Bruce's and Mark's business was handshake in nature. Mark certainly wasn't a very good businessman, and that can be attributed to his ambition to be solely focused on building houses. Bruce often joked that Mark would rather build a gated community in a blue-collar neighborhood in opposition to making money. This background brings me to the seminal event that cemented my unwavering positive opinion of Mark. In July of 2018, Bruce was diagnosed with stage 4 cancer. Bruce (unmarried, no children) was so private that of the 250 people at his memorial service, only 5 or 6 had been aware that Bruce was suffering this fatal disease. Bruce called Mark, not to tell him that he was sick, but just to see if Mark would come to visit. This was November 2018, and Bruce knew he had little time, Mark was dear to him, and he wanted to spend time with him. By the sound of his voice, Mark knew Bruce was in dire shape, and he immediately came, and he came every day for the next 7 or 8 days, until Bruce perished.

ONYX CAPITAL CORPORATION

Mark spent all day every day with Bruce, rubbing his feet, reminiscing about all the travels and experiences they shared. He arrived early and stayed all day and early evening. Now, the critical event that didn't take place cements my opinion of Mark. Near the end of his life, Bruce remained perfectly lucid and was capable of exercising decision making and execution of documents.

In fact, we were executing estate documents right up to the time of his death. Bruce left 90% of his substantial fortune to charity with the remainder going to his mother, two siblings, and a longtime girlfriend. So, I was a firsthand witness to Mark's interaction with Bruce in his final days. At the time, Bruce's and Mark's handshake relationship was absurdly in Bruce's favor, a situation in which Mark had paid Bruce approximately $1,100,000 of recorded obligations that had not yet been reconvened to demonstrate the payoff. Mark did not once bring up or utter a single word to Bruce to re-convey the already paid notes. When I asked Mark about this later, he remarked how would you, or for that matter anybody feel being pressed for money on their deathbed? I had mentioned to Mark (I had peripheral knowledge of their handshake agreements, although, I was powerless to enforce them, as I wasn't the trustee of Bruce's trust) that these handshake deals were going to be problematic.  Mark said he didn't care, and Bruce's last days needed to be peaceful. In the end, Mark and the trustee worked out most of their issues, but not without substantial financial loss to Mark. The point of my letter is, I know Mark to be motivated by many things, certainly money, but please know that money is secondary in Mark's life, and his engagement in Bankruptcy fraud is so strange to me. I see Mark interact with his wonderful family, influencing his children to lead lives of positive social impact. His eldest daughter is a Fullbright scholar that lived a year in Manaus, Brazil making a documentary on a diminishing Sephardic community. His eldest son is working for Legal Aid, Chicago prior to attending law school and fulfilling his ambition of helping the disenfranchised, and two other productive children at University of Wisconsin and Moorpark college. I know his family well, they reflect Mark and his wife's (Sarah Lulloff) constant modeling to do "the right thing" In closing, let me say, I'm not sure how Mark found himself here, but I can assure you, it is a tragedy, Mark is a broken man. I pray that after the final completion of his ordeal, he can become the man I once knew. He has done untold good in his past; I hope he recaptures that ambition.


Thank you for your consideration,

Peter Tripp
COO
Onyx Capital Corporation
Mobile – 310-804-9203

June 26, 2023

The Hon. Otis D. Wright II
350 W. 1st St.
Los Angeles, CA 90012

RE: United States of America v. Mark Handel 2:20-CR-00612-1-ODW

Dear Honorable Judge Wright II:

I am writing on behalf of Mr. Mark W. Handel.  Mr. Handel and I have been friends for the better part of 20 years.  In that time Mr. Handel has proven to be a fine and responsible person of good character. I do not say this lightly. I have seen Mr. Handel interact in many different ways with different people over the years.  Some of those people have been powerful.  However, when I think about Mr. Handel's character, I think of the times he has shown kindness, generosity, and understanding to people and causes that benefit the less fortunate.

Even though I came into his association through work in 2002, I have also known him outside it. I observed his generosity over the years in providing financial support to help working class college students of color be the first to attend a university in their families, or the times he was called by members of the community or halls of power to provide for toys during the holidays, and other contributions to people in need.  These were not isolated incidents of giving. In many instances over the years, I have seen Mr. Handel's willingness to give his time to friends or strangers to provide comfort or assistance. And while he may have done so with his typical sardonic witticism it was always from a good place in his heart. In fact, I think over the years there were many who took advantage of Mr. Handel's kindness and his willingness to give.

Let me be clear - Mr. Handel is no victim. While we have not talked at length about his current legal situation he has shared with me his regret and embarrassment over this matter.  He loves his family deeply and his sense of remorse for the pain they have gone through. I am pleased Mr. Handel is prepared to take responsibility for his actions. I am convinced he will emerge from this as a better person.  Despite the current case, I still find Mr. Handel to be a good person and a valuable member of the community.  I firmly believe in his ability to pay his debt to society and hope when this is behind him, he is given the opportunity for redemption.

It is my sincere hope the court takes this account of my friendship and experience with Mr. Handel into account at the time of sentencing. I can be contacted at (818) 263-2471 or at Raul@RaulBocanegra.com if you have any questions.

Sincerely,

Raul Bocanegra



5820 Canoga Avenue, Suite 300<br/>Woodland Hills, CA 91367<br/>T (818) 933-0200<br/>F (818) 933-0222<br/>www.gaineslaw.com

June 22, 2023

Honorable Otis D. Wright II
United States District Judge
Central District of California
350 West 1ˢᵗ Street
Los Angeles, CA  90012

Re:  US v. Mark Handel
     Docket No.: 2:20-CR-00612-1-ODW

Dear Judge Wright:

I am Fred Gaines, a personal friend and professional colleague of Mark Handel for approximately 20 years. I have seen Mark work with communities throughout Southern California to bring about positive change, redevelopment of blighted areas, economic opportunity and job creation. With almost every project I have worked on with Mark, he has made significant contributions to local programs, charities and religious organizations beyond anything required by the project itself.

Mark has a wonderful family, which has always been his priority. I have personally witnessed his commitment and sacrifice for his children, and we have spoken often about the duty and importance of being a good father.

I previously served as Mayor of the City of Calabasas. Mark was a longtime and respected volunteer with the City. Specifically, he served for many years on the City's Architectural Review Committee. He was also an active volunteer with our local public schools and with our Jewish community center, the Chabad of Calabasas. In all of these involvements I have known Mark to be a trusted, responsible, fair and empathetic person.

Placing Mark in a prison environment will not be helpful to society. I feel that it would be to Mark's and the public's best interest to serve a punishment that will not negatively affect his service to the community and his commitment to his family. Thank you for your consideration.

Sincerely,

GAINES & STACEY, LLP

*Fred Gaines*

By

FRED GAINES



July 13, 2023

The Hon. Otis D. Wright II
350 W. 1st St.
Los Angeles, CA 90012

RE: Character Reference for Mark Handel

Your Honor,

I met Mark Handel on or about 1990 when I was working for one of his vendors.  As I got to know Mr. Handel, I established a relationship with him and realized how special his personality was.  Although I was a salesperson at the time, which he hardly knew, Mr. Handel treated me with much respect, just like he would treat someone that he had known for a long time on a personal or business level.  After selling services for a subcontractor who I was working for to Mr. Handel for about two years, Mr. Handel offered me a position to work for his company.  I started working for Mr. Handel in 1992 and worked for him until 1994.  While working at his firm, Mr. Handel offered me the opportunity to buy 50% of one of his businesses that I was running for him.  He surprised me with his generous offer as the price was only $1.  Although I was very honored, I told Mr. Handel that I thought it was unfair for him to sell me 50% of his business for $1.  Mr. Handel insisted, and we ended up becoming partners at 50% each for $1.

In 1994, when I decided to leave Mr. Handel's firm and start my own construction company, I went to Mr. Handel and I told him that I want to sell him back 50% of the company for $1.  I felt that was the right thing to do since I had so much respect for Mr. Handel.  Mr. Handel tried to convince me that the company was worth more and tried to convince me to stay, but I had a dream of having my own company and convinced him to buy back 50% for $1.  During my work relationship with Mr. Handel, we acquired a small company as 50/50 partners.  Although we acquired it at a very good price, when I left Mr. Handel's firm, I asked him if I could buy his 50% of the company for 50% of the cost we paid for that company.  At that time, that price was a very good deal to me since the value of the company was higher.  Mr. Handel agreed and again showed his character by being fair, generous, and honest.

Later, although I had started my own company and sometimes we competed on purchasing certain real estate, we kept a good relationship throughout the years.  Around 2006, I wanted to purchase vacant land that Mr. Handel owned in a community that he lived in to build my own family home.  Although Mr. Handel could have developed that property and made money, as a friend he agreed to sell the property to me at a fair price.  I ended up building my home there and lived there from 2009 to 2020.  During these years, I was a neighbor to Mr. Handel and his family, and they were great neighbors to live around.  Mr. Handel and I also served on the Board of the Homeowners Association together for a few years.

In all my years dealing with Mr. Handel, either on a business or personal level, he was always fair, generous, supportive and a great friend.  I learned a lot from Mr. Handel while I was working for him and while I was selling services to him, and I owe him a lot for what I have learned throughout the years.  As a matter of fact, we were joking that one of the things that helped me a lot in business was that I learned



from him what not to do in business. On a few occasions, I even mentioned to him that he should teach a class in college about what not to do in business. The reason I mentioned that is because Mr. Handel's character in business was not different than his character in his personal life. The reason is that Mr. Handel was always willing to take care of the people who worked for him and the contractors who provided services to him, no matter if it was the right business decision for his company. He always looked out for them and took care of them first. As a businessman, sometimes we must make tough decisions that will not benefit our employees and vendors, but Mr. Handel always took the side of the people and not the ability to save or make more money. His reputation throughout the years was that he was very fair and a very good developer to work with and for.

In addition, Mr. Handel was always a community person. In all his development projects, he always looked out for the community too. He improved many communities across Los Angeles. While I was working for him, we used to build homes in neighborhoods that were unsafe to even drive through. However, due to his vision and wish to improve the community, we developed housing in these communities which brought families and jobs to these areas. I believe that Mr. Handel deserves a lot of credit for improving these neighborhoods and providing workforce housing since he was the pioneer who went into these neighborhoods and started developing them.

I also know that Mr. Handel, like many in the real estate business, had some financial issues. What I was always impressed with is that Mr. Handel always tried to make things right and always tried to ensure that the people who worked with him and for him were getting paid for their services. While I was working for him, I got to know some of his personal friends and was always impressed by how much he was loved and admired by the people around him. Mark is one of those guys who you want to be around and be friends with because you know he will always be there for you. I know that the last few years have been very challenging for Mark and his family and I'm very proud of him for how he has handled himself during these challenging years and for the fact that he's taking responsibility for any of his actions. His main concern has always been his family, his employees, his friends, and not himself, which is something to admire. If you or the court wish to verify the content of this letter, please don't hesitate to contact me at 818-577-5888.

Sincerely,

Shawn Evenhaim
CEO
Balaciano Group

The Hon. Otis D. Wright II,
350 W. 1st St.
Los Angeles, CA 90012

RE: The matter of the United States of America v. Mark Handel 2:20-CR-00612-1-ODW

Your Honor,

I am writing to express my unwavering support for Mark Handel, a real estate developer who as I am aware has plead guilty to bankruptcy fraud and tax crimes. I learned of Mark's development work throughout our friendship during the years. Although I do not condone his actions, I would ask that you consider Mark's work towards the advancement of the Latino community.

I have had the privilege of knowing Mark Handel personally and witnessing the immense positive impact he has had on our community, particularly in advocating for the right and representation of the Latino community in government within Los Angeles.

As a major advocate for the Latino community, Mark has dedicated his time, resources, and energy to promoting equal representation for Latinos in the political arena. His relentless commitment to addressing the challenges faced by the Latino population and fighting for their rights is truly commendable. He has worked tirelessly towards creating opportunities and platforms that empower individuals from diverse backgrounds to participate in the political process and have their voices heard.

I have seen firsthand the passion and integrity with which Mark has approached their advocacy work. Through various initiatives, including organizing community forums, fostering dialogue between community members and political representatives, and encouraging civic engagement, Mark has been instrumental in bridging the gaps that exist and ensuring that the concerns and aspirations of the Latino community are taken into account.

It is disheartening to hear Mark may now face prison time for these charges. I firmly believe that his commitment to social justice and equal representation should not be overshadowed by these difficulties. His work has not only positively impacted the Latino community but has also fostered a more inclusive and equitable society for all Angelenos.

I kindly request you to consider the extraordinary contributions and achievements of Mark when reviewing his current situation. I am confident that given the opportunity, he will continue to be an invaluable asset to our community and contribute positively to the growth and prosperity of all its members.

Kind regards,

James Acevedo

*Toney Dickerson*
*12252 Califa Street*
*Valley Village, CA  91607*
*(818) 515-7576 - Cell*
*toneydickerson@gmail.com*

August 21, 2023

The Hon. Otis D. Wright II
350 W. 1st St.
Los Angeles, CA 90012

Re:  United States of America v. Mark Handel 2:20-CR-00612-1-ODW

Dear Judge Wright II,

I am writing this letter to provide a character reference for Mark Handel, whom I have known for over 25 years, in a professional capacity and more recently in a personal capacity.

I have had the privilege of working closely with Mark on many of his housing development projects over the years and during this time, I have come to know him to be a person of moral character, integrity and ethics.  Mark has always appeared to me, to conduct himself in an exemplary manner during all of our dealings.

Mark has presented a strong commitment to responsibility, accountability and honesty. I have always experienced Mark to be professional, reliable and display ethical behavior in all our interactions.

In all of my dealings with Mark, I have never been aware of him not paying or avoiding his monetary obligations.

I hope that my perspective on Marks character can contribute positively to his situation.

Please feel free to contact me at (818) 515-7576 or toneydickerson@gmail.com if you require any further information or have any questions.

Sincerely,

Toney Dickerson

August 24, 2023

The Hon  Oti  D  Wright III

350 W. 1st St.

Los Angeles, CA  90012

Dear Judge Wright,

I have been a personal friend of Mark Handel's for almost 25 years. I am currently a reporter but begin my career in politic , working in the Clinton White Hou  e and then for Governor Gray Davi  and Univer  al Studio  in the Government Affair   department  I met Mark becau  e we had mutual friend  in political circle  and Mark wa  a prolific fundrai  er for cau  e  he believed in  He had friends in all areas of politics and in the nonprofit sector that I met through him and learned of his great contributions to. Mark gravitated towards social justice issues and even in losing causes, he spared no expense or expenditure of his time. His passion was admirable, and even through these trying and difficult times, he remains an admirable person.

I've spoken to Mark many times since his indictment and guilty plea, and it is taking a great toll on him and his family. He is worried about being away from them for so long and missing out on so many milestones in their lives and also just being there in person for them as they go out into the world. However, he never makes excuses, never dodges responsibility and is resigned to his fate.

This has been a very difficult year for me personally and Mark was a dedicated friend as my mother suffered a rejection of her lung after a transplant she needed because of her autoimmune disease and her death in March. She meant the world to me and being able to talk with him about my immense sadness and having him make me laugh was a much needed relief. When he saw how devastated my entire family was, he opened his home in Wisconsin to us, offering to let my husband, 9-year-old son and grieving father stay there this summer. When I asked if he had ever been to the famous W sconsin Dells water park he said, "Only every summer that my kids were seven to 14." He helped plan our trip, sharing all the fun memories he had with his own children and lived vicariously through our adventures. We all had a much needed break through Mark'  graciou   gift that my family and I will alway   remember  In our

moment of grief, Mark in  pite of hi  con  tant per  onal turmoil wa  unequaled in hi  thoughtfulne    and con  ideration of me and my family, e  pecially, my father! What a joy to spend two weeks with his grandson in Wisconsin.

I truly believe after having   een him interact with my family and hi   own family over our two decade  of friend  hip that he de  erve   any con  ideration that you would   how to him

Sincerely,

Ale  i  Tere  zcuk

310 435 6989



August 14, 2023

The Hon. Otis D. Wright II

350 W. 1st St.

Los Angeles, CA 90012

Re: The Matter of the United States of America v. Mark Handel 2:20-CR-00612-1-ODW

Your Honor,

Thank you for the chance to write on behalf of my friend Mr. Mark Handel.

I'm aware of his legal trouble, and the fact that he accepted responsibility for his actions and is awaiting sentencing. Therefore I am writing to Your Honor today, to intercede on his behalf and appeal for the court's forbearance and compassion, that Mr. Handel not be separated from his family.

I have known Mr. Handel for over ten years. We met when he was building next door to us and he came over to introduce himself. Since then, he and his family have been great friends, a unique presence in my life and the lives of my family.

Mr. Handel has always exuded a positive vibe and been a source of encouragement and optimism. Those I know who have worked with him like him and appreciate his fair and frank honesty and no-nonsense style.

I am grateful for his tremendous assistance in the development of the Jewish Synagogue and community center that my wife and I operate in Calabasas. Mr. Handel encouraged us to grow it, to build and expand, and held our hands through the complex process of dreaming, planning, applying, and everything else that goes into such a project. He gave happily of his time, his experience, his know-how and his passion, and he did this all with no expectation of repayment but as personal favor and a community service, like a mentsch.

But more than anything, from my vantage point, Mr. Handel is a warm, loving, involved, supportive father to his children. The pride and joy he takes in his children's efforts and achievements is as real as it gets, an unadorned thing of beauty that I have always respected him for.

Your Honor, Mr. Handel is a kind and generous man, a solid friend and a loyal father.

Any mercy and courtesy extended to him is greatly, deeply appreciated.

Respectfully,

*Eli Friedman*

Rabbi Eli Friedman
Chabad of Calabasas

The Hon. Otis D. Wright II

350 W. 1st St.

Los Angeles, CA 90012

The matter of the United States of America v. Mark Handel 2:20-CR-00612-1-ODW


Dear Hon. Otis D. Wright II:


I have known Mark Handel since approximately 1990.  I met him initially through business, he was a home builder and I was a lender who financed these types of projects.  Further, we had some mutual friends and became friends in addition to business associates.  Over the years our families became friends as well.  We moved to Portland, Oregon about 15 years ago.   Often when we visited Los Angeles we would stay as guests in the Handel home.  Mark is devoted father, I personally went to many after school activities with he and his kids.  He was very involved within the Girls Soccer community.  He knew everyone there, did not matter which venue. I saw many parents conferring with Mark.

Businesswise, I can tell you that I have had only positive interactions.  I have also witnessed, Mark volunteering to help others with advice. Please consider this letter as a Character Reference for Mark Handel.


Sincerely,


Chris Eber

# EXHIBIT C

Monday, Aug. 05, 1974

# Behavior: Valley of Horrors

The Rev. George von Hilsheimer, 39, a self-styled minister in the Free Religious Association, is fascinated by psychiatry. Though he has no degrees in the subject, he likes to talk about such "therapies" as electrosleep, vivid confrontation, megavitamins and hypode-sensitization. What is noteworthy about Von Hilsheimer, however, is that he has been able to try out these techniques, and others as well, during his nine years as superintendent of the Green Valley School for emotionally disturbed and delinquent children in Orange City, Fla.

If a child misbehaved, for example, Von Hilsheimer would sometimes gather the students together to declare him "morally dead"; then, concocting his own version of reality therapy (which denies the importance of past traumas and encourages a patient to cope outright with his current dilemma), Von Hilsheimer and the students would force the youth to dig himself a grave and lie in it overnight. "I think it is a beautiful symbolic thing for the kids to go through," he explained. "It's a way of forcing them to look at themselves." At other times he would shackle the child, jolt him with an electroshock machine dubbed a "lalapalooza," or shut him up in a storehouse.

All this came to light last week at hearings conducted by the Senate's Permanent Subcommittee on Investigations. The Senators are probing a federal medical-insurance program called CHAMPUS (Civilian Health and Medical Program of the Uniformed Services), the benefits of which Include payment for the care of emotionally disturbed children of military personnel in 486 schools and psychiatric centers round the country. Senate investigators claim that CHAMPUS administrators do not properly check out facilities before handing over money. Green Valley, they point out, has received $1.2 million from the Government over a three-year period to perpetrate outrages that Committee Chairman Henry Jackson called worthy of "Hitler, Use Koch and Buchenwald."

In 1973, Florida investigators testified, the school was raided by state officials; among other brutalizing instruments, they found shackles and a brown leather whip. One nurse said she had treated numerous bruises from chains. Von Hilsheimer told TIME Correspondent Joe Kane that his young charges were "miserable, hateful, violent bastards." The school's former headmaster, Ronald E. Nowicki, could also be violent. In a fit of anger he punched a female student so hard that he ruptured her eardrums.

Allergy Treatment. At the hearings, former staff members testified about Green Valley's various treatments. They said that Dr. William Philpott, a consulting psychiatrist who practices in South Attleboro, Mass., believed that mental disorders stem from allergies. He tried to treat the allergies by having students inhale carbon dioxide gas. (Two of his former patients in Maryland died following carbon dioxide inhalation therapy, and Philpott was acquitted of manslaughter in 1966.) According to the former head nurse, Esther Johnson Snow, another consultant, Dr. Sol Klotz of Orlando, Fla., told her to inject a student with his own urine as a test for allergy. Klotz also made a serum of dirt, dust, and other substances and told the nurses to inject it into students as an allergy treatment.

Von Hilsheimer insists that he is being persecuted. In response to his critics, he claims that 86% of his students go on to live normal lives in the outside world, though he has done no follow-up studies. He is also proud of the fact that there was "only one" suicide at his school. In 1968 a disturbed boy named Michael Waker, 18, killed himself with a pistol Von Hilsheimer had allowed him to purchase; later the boy's mother was billed for the gun. Another boy, depressed to the point of suicide because his mother had just written telling him how peaceful it was at home without him, was also handed a gun by Von Hilsheimer, but he decided not to use it.

Green Valley is not the only school to be scrutinized by the committee. During the hearings, Senate investigators charged that at the University Center, a residential psychiatric-treatment center in Ann Arbor, Mich, (it has no connection with the University of Michigan), students who continually misbehave are locked for days or even months in a "seclusion room." The school, which has received more than $1 million in CHAMPUS funds since 1969, is also accused of being lax about widespread drug use; students who enter the institution with problems other than drug addiction quickly become hooked.

Such revelations may improve the situation at Green Valley and the University Center. But the real problem spreads much further. Senate investigators feel that there are countless private psychiatric facilities round the country that exploit their charges and even use government funds to do so. State and local agencies, which generally have the responsibility of supervising and licensing these facilities, frequently lack the funds and manpower to do an adequate job. Until something is done to change this, the nation will continue to have what Senate investigators call "commercially operated jails."



EXHIBIT D

No. X-24
District Court of Appeal of Florida, First District

# Green Valley School, Inc. v. Cowles Florida Broadcasting, Inc.

327 So. 2d 810 (Fla. Dist. Ct. App. 1976)
Decided Mar 26, 1976

No. X-24.

February 18, 1976. Rehearing Denied March 26, 1976.

Appeal from the Circuit Court, Volusia County, J. Robert Durden, J.

Craig T. James of Clayton James, Deland, for appellant.

P.S. Paul and Sanford L. Bohrer of Paul Thompson, Miami, for appellees.

RAWLS, Acting Chief Judge.

On February 10, 1973, at 6:00 p.m.,[1] appellees Todd and Rozier, employees of appellee Cowles Florida Broadcasting, Inc., published the 811 following narration on *811 WESH-TV, Channel 2 (television station owned by appellee Cowles):

[1] Approximately the same version of this broadcast was presented on Channel 2 News at 11:00 p.m. the same night.

"FRED BREWSTER [newscaster]: The President of a controversial private school in West Volusia County was arrested last night along with three staff members as a platoon of law enforcement officers raided the facility. The President was charged with `False Imprisonment' and the staffers held on narcotics charges. Channel 2's Dean Todd was there and files this report:

"DEAN TODD: No less than 50 law enforcement officers from all departments in Volusia County except DeLand and the Sheriff's Office gathered last night in DeLand under the leadership of Chief Investigator Jack Lynady of the State Attorney's Office. They were about to swoop down on the controversial Green Valley School in Orange City after over two years of investigation they planned to arrest Ronald Nowicki, Headmaster and President. Charge: `False Imprisonment'

"The Law Department sprang after a Phys. Ed. Instructor, identified only as a Mr. Kelley, told police it was common practice to lock up the students for days, even weeks at a time. But there was even more. There were allegations of rampant sexual conduct between students themselves and between staff members and female students.

"Nowicki was rousted out of his bed at his small, untidy apartment in a building known as the Monastery. With him was a young, female staff member — he told investigators they were on night duty together.

"About 65 students live on the campus and while Nowicki was being advised of his rights the other officers began securing the other buildings in military fashion. According to officers, some of the male and female students were living in the same dormitories. Most of the rooms were in apparently permanent shambles. The rooms were filthy, even those of most of the staff members were in complete disarray.

"It wasn't long before officers began turning up drugs by the armload. Many were vitamins, many were prescription drugs which have not been identified by the searchers.

"Something else was turned up during the searches: These are electric shock collars. They are made for dog training, but here, according to some of the students, they are used on them, occasionally. Also turned up were a set of shackles and handcuffs used to bind the children. Apparently such implements were expected to be found by the raiders.

"This is 15 year old Mitchell Spalding of San Diego, California, on the right; 14 year old Marc Corren of Miami Beach. The State of California pays $16,000.00 a year for Spalding to stay here. The filth is astounding. Spalding and Corren both told Channel 2 News they had electric cattle prods used on them by staff members and that it was common.

"DEAN TODD: Did they use a cattle prod on you?

"MITCHELL SPALDING: Um, yea, they used it once on me.

"DEAN TODD: For what?

"MITCHELL SPALDING: For nothing. I was asleep and they came up drunk and

"DEAN TODD: Who did?

"MARC CORREN: Me.

"MITCHELL SPALDING: Ah . . .

"MARC CORREN: Staff, staff members man.

"MITCHELL SPALDING: Ah, it was Mike Hannigan and I, I was asleep at the time and so I don't know who else *812 did it. But they come up with this bull shocker, ya see, ya know, they really bull shocked me but I hadn't done anything.

"MARC CORREN: I mean that is enough to drive a cow sick man, it could even hurt you, you can feel pain for the next four days.

"DEAN TODD: This is the block house, inside it is bare. Students are reportedly locked inside for days. Eighteen year old Sue Borman of Levitt Town, Pennsylvania, told us that she had been locked in there once, for a week.

"Simultaneously, a Marina, owned by the Green Valley School also was raided. Some six of the students were found when law enforcement officers came upon the area West of DeLand, a short distance South of the Hontoon Marina. The main object of the search was an old boat, a World War II mine-sweeper converted into a diving rig called the `FEARLESS' and reportedly housed students in certain detention cells. But the `FEARLESS' apparently has not left its birth [sic] for two years. It has, aboard it, a decompression chamber. It is supposed to be used primarily by divers stuck with the bends or nitrogen narcosis.

"Informed sources told us that students had been locked in here, as punishment. A brig, located in the bow of the ship, was filthy and rat infested, students reportedly were housed in here, human excrement was also found in this area.

"Back at the school, officers continued to find more pills, some in the room of an instructor. A collection of color slides which graphically detailed several nude women was found in the therapy room as well as a host of electric instruments.

"The searches continued until dawn. Investigator, Lynady summed up the arrest that had been made then:

"JACK LYNADY: A man was arrested for `False Imprisonment', another man was arrested for possession of, ah, marijuana, and ah drug paraphernalia, two girls were arrested for ah . . .

"DEAN TODD: It may be sometime before the full implications of last nights raid are known.

"The Federal Government reportedly pays the School about $600,000.00 a year, various states and private individuals pay `exorbitant' amounts to house delinquent children and some with medical problems here.

"The apparent owner, George von Hilshmier, was in Canada. He apparently runs one or two other similar schools; one located in New York.

"Accompanying the officers last night were Internal Revenue Agents who confiscated the School's financial records.

"Some of the children reacted to the raid with fear, some with surprise or amusement. They may have a lot to tell later.

"This investigation, which began two years ago, may be just beginning.

"Dean Todd, Channel 2 News, Orange City.

"FRED BREWSTER: State Attorney, Steven Boyles, said the School could be closed as a public nuisance. Boyles told Channel 2 Green Valley is chartered by the Circuit Court under a State Statute on private schools, and that a ruling as to the application of the law as it relates to the Green Valley School might be obtained from the Attorney General.

"Further charges may be filed pending the outcome of the lab tests of the various drugs taken last night."

As a result of the foregoing, Green Valley filed its complaint sounding in libel and slander and malicious trespass. Extensive discovery was had together with numerous hearings, resulting in a large pasteboard box of records numbering some 22 volumes and more than 3,000 pages. The trial 813 *813 court entered summary judgment in favor of appellees; hence this appeal.

Two points are posed for our consideration, viz: 1) The record shows substantial issues of material fact, and 2) The trial court erred in denying appellant's Motion and Application for Disqualification.

Additional facts are material. Prior to the above mentioned raid, Jack Lynady, Chief Investigator for the state attorney's office of the Seventh Judicial Circuit, procured a search warrant commanding:

". . . ALL AND SINGULAR THE SHERIFF AND/OR DEPUTY SHERIFFS OF VOLUSIA COUNTY, FLORIDA, OR INVESTIGATORS FOR THE STATE ATTORNEY'S OFFICE, SEVENTH JUDICIAL CIRCUIT, STATE OF FLORIDA [to search]:

". . . Those lands described in deed of record in Official Records Book 1196, page 629 of the Public Records of Volusia County, Florida,[2] believed to be the property owned by Green Valley School, Inc., is being used as a means to commit the felony offenses of false imprisonment, child abuse, and lewd and lascivious behavior. . . ."

[2] Appellant contends that the search warrant is deficient in that it fails to describe with particularity the premises to be searched and, further, that the record referred to described at most 25 percent of the premises searched by the raiding party.

The warrant further authorized the search to be conducted either in the daytime or nighttime. Lynady arranged a raiding party of some fifty policemen from several municipalities within Volusia County and employees of the state attorney, who were designated "special investigators" by the state attorney.[3] Lynady also invited appellees Rozier and Todd and other news media personnel to participate in the midnight raid. The party was briefed by Lynady during the evening of February 9, 1973, and at approximately 11:30 p.m. the search party, accompanied by Rozier and Todd (and other news media personnel), arrived upon the premises of Green Valley. Excerpts from various affidavits and depositions regarding the raid reveal the following:

[3] Mrs. Emmett Rozier, Lynady's personal secretary and the wife of appellee Rozier, was designated as a member of the search party.

Edward Brenner — Teacher and Counsellor

"4. At about midnight or sometime thereafter, I was awakened by several beefy, ununiformed men who claimed that they were policemen and who ordered me to remain just outside my room. These individuals refused to produce identification, displayed no badges, and would not produce a warrant. I asked them by what authority they were there and they refused to tell me anything more than `this is a raid, and we are going to get the goods on you.'

. . . . . .

"6. These obese persons began abusing the children in my care with verbal threats and by telling them to `tell everything you know and it will go easy on you kid'. They asked each child many leading questions. Two of the children, both of whom were obviously highly agitated, and both were known to me to be highly disturbed children began to answer questions about abuse and illegalities in a positive manner. They were then stopped by the cigar smoking fat man questioning them who shouted to others to `call the TV camera, get Todd over here'.

"7. A white station wagon clearly marked as belonging to Channel Two then arrived and another plump man and a TV camera man with several other individuals got out. They then filmed Mitchel Spaulding, a boy then just a few months out of a mental hospital and now again in a state mental hospital, who was *814 to my eyes and who appears to me on the TV program filmed by Channel Two, to be highly disturbed and agitated. They also filmed Michael Corren, a boy with a long delinquent history who also was very obviously under great mental strain.

"8. The cigar smoking person who claimed he was a policeman took the lead in telling the boys what to say. In no way did the transaction resemble a questioning. The boys were told what to say and parrotted it. This was obvious to the plump person from Channel Two who seemed to be the announcer and who subsequently has been identified to me on the TV program as Dean Todd. It was also obvious to the individual accompanying him.

. . . . . .

"Any dirt, filth, pictures, or other disarray and mess was caused primarily by the first group of overweight cigar smoking men who called themselves police. These men pointedly and particularly arranged furniture, sheets, trash, and vitamin pills in groups for the TV camera men. This was done in the full view of the second group of men, including Dean Todd, the plump man who seemed to be the leader of the group emerging from the white station wagon."

Susan Borman — Student

"7. I love Green Valley School and I saw the television program on WESH-TV and it was just one lie after another. It was especially a lie when it said I said I had been locked up for weeks in the Bomb Shelter. I did not say it, I only kept telling them to leave me alone and that I did not want to get into trouble. . . . I was afraid of what they would do to me especially after they [sic] way they tore up my room. I did not know what my rights were and they just came into my room like burglars and scared me to death and then told me I could go to jail after they tore my room all apart and made it a terrible mess. Every where you could see them tearing up rooms like animals."

Faye Brown — Staff Member of Green Valley

"4. At 1:45 a.m. a group of roughly dressed men entered the Medical Center and announced that they were searching the entire building and campus.

. . . . . .

"7. The WESH-TV Channel Two Team appeared at the Medical Center shortly after the men arrived and were told by one of them, `We aren't ready for you yet, come back later.' They entered the building without knocking and were not invited to come in."

Wendy Clark — Teacher

"2. I was awake when a group of men, who refused to identify themselves to me, swarmed into the Quads and made all the children leave their rooms and stand in front of them. They would not identify themselves to me, they showed me no warrant or any other piece of paper. They were dressed more or less like hunters and their mood and actions were like that of a group of college boys at a `panty raid.' The only indication that they were policemen, was that they told me I would be arrested if I moved from in front of my room.

"3. I found the experience terrifying and so did the children in my charge. Several of the girls were jerred [sic] at and their inadequate clothing pointed at repeatedly by the strangers and especially the men from the station wagon from WESH-TV. . . . Their behavior was like that of nasty boys while crashing a girl's picnic when the adults are away."

Harry Detweiler — Public School Teacher from Ashland, Oregon — Volunteer in order to learn about successful methods of working with very disruptive children.

815   *815

"2. Sometime after midnight on February 9th [February 10], 1973, I was awakened by a great deal of racket in the Administration Building where I occupied the single bedroom upstairs. By the time I came down the stairs there were more than twenty people in the building.

"3. The men had obviously gotten in by breaking a door and one of the men had cut himself pretty badly. No one would give me a warrant or any identification although they asked for my identification.

"4. There are several thousand slides in one of the three treatment rooms upstairs. The men were going through the slides with a great air of comedy. The majority of the slides have to do with innocuous subjects and are used to treat phobias by the psychiatrists or their aides here. A few of the trays deal with nude human figures and these were greeted with great enthusiasm by the men, and especially those whom it was easy to identify as newsmen and the men from WESH-TV Channel Two.

. . . . . .

"6. WESH-TV and the still photographers spent a great deal of film on a large plastic bag full of comfrey tea (an old fashioned herbal tea). It was clearly labeled and to the eye does not look anything like parsley, oregano or the marijuana identification kits they give out to school teachers. The newsmen were totally uninterested in my statements that it was unfair to take pictures of herb tea and call it drugs. In the WESH-TV program I saw that the bag of tea was shown while Dean Todd talked about `armloads of drugs.'"

Carole Rice — Student at Green Valley for several years

"3. My girlfriend, Cathy Hynds, had been in bed dressed in a man's tee shirt. It was barely long enough to cover her legs. The police would not let her get dressed.

"4. The station wagon came over and the camera man took pictures of my room. The room looked awful, but I always have a clean room and it was only because the cops had torn it up.

"5. While the man who is called Dean Todd on the TV was standing by my room, he kept pointing at Cathy Hynds and laughing and joking and being awful. I was so mad that I cried. Poor Cathy was humiliated. When I saw that fat face again at a press conference I was so mad I had to leave. He acted like a bully that night. All of those men were joking and laughing and making nasty remarks. They must think we are stupid because one would be sticky sweet and say he was helping us and another would be nasty and say `tell us where your drugs are,' `do you take them in your arm,' `where's your needles?' They kept it up for hours.

. . . . . .

"7. I saw the TV broadcast that Dean Todd did and he is just a liar. He helped those cops mess up things, and he only took pictures after the cops called him over with some special goodie they had made up. He was ugly and obscene to the girls and made Cathy especially humiliated."

Martin Hoade — Counsellor at Green Valley for four years

"14. I am also familiar with the ship, the `Fearless,' and have been entirely through the ship on many occasions. I have at no time seen any evidence of rats. The ship has never been used for feeding, even during its career in the U.S. Navy, and the permeation of the ship with diesel fuel during the period in which the Navy was not using it, it was docked at Washington, D.C. There is no brig on the ship. The ship was delivered to the School in March, 1972, contrary *816 to the news report of WESH-TV. At no time during that eleven months have I seen the ship or its quarters to be filthy, no child has been locked in any portion of the ship, and most particularly has no child been locked in the recompression chamber. I have had free access to the ship and the nature of my duties make it necessary for me to go onto the ship at irregular intervals. It is physically impossible to lock the recompression chamber from the outside, and

Peggy Milner

"1. My name is Peggy Milner and I am presently a teacher at the Glaydin School in Leesburg, Virginia, and I was for three years a Teacher, for two years Dean of Women, and for one half a year Academic Dean at Green Valley School.

. . . . . .

"19. I have seen the tape of the broadcast made by WESH-TV purporting to be news of the raid. It is utterly unfair and distorted.

. . . . . .

"24. The TV crew from WESH-TV had complete access to the Campus. They focused on two areas, the Boy's Dome, in which six children lived and the Quadrangles, in which about ten children lived. They did not enter any area until it had been thoroughly disrupted by police and mud dragged in on belongings scattered on the floor. They saw no evidence of sexual misconduct, they saw no evidence of sexual misconduct between staff and children. They observed areas in which less than ten of a Staff of more than forty lived and deliberately lied about the condition of both Staff and children and their quarters."

Ronald E. Nowicki, headmaster and teacher at Green Valley for seven years, testified on deposition:

"Furthermore I called Channel Two after the six o'clock news and I stated that I considered the six o'clock news to be mostly false and malicious and if they repeated it at eleven o'clock we would file a suit, and it was repeated in toto at eleven o'clock.

. . . . . .

"A. I told him that the rooms were a mess after the raiders had looked through them, not before that. And that I was not rousted from my bed, that I was in fact on duty that night and cooking in the kitchen.

"Q. Now, other than these two facts which you have stated, do you have any other facts or any other evidence which would support your contention that the newscasts were specifically designed and prepared to defame, slander and libel Green Valley School?

"A. Yes, the newscasts said that IRS men participated in the raid and seized financial files.

"Q. Anything else?

"A. Some statement to the effect that the beverage control people were there, but I have no knowledge of that either.

"Q. Do you have any knowledge that Channel Two was not in fact told that IRS men would participate?

"A. They didn't state that in their broadcast. They didn't say that they had been told, they said IRS men was [sic] there and seized financial files."

This record further reflects other evidence to impeach the statements: "after over two years of investigation they planned to arrest Ronald Nowicki, Headmaster and President", "rampant sexual misconduct", "rooms were filthy", "drugs by the armload", and other items reported as eyewitness news. The record clearly reflects extensive communication between appellee 817 Cowles' employees and the state attorney's *817 office immediately prior to the raid.

Appellees, in their excellent brief and appendix, first contend that appellant cannot recover for libel because the allegedly false statements are true in every respect. They set forth excerpts of the allegedly false statements and compare each, primarily, with an article prepared by one Robert Sherrill which was attached to an affidavit executed by him.[4] In his affidavit, Mr. Sherrill stated that he had prepared an article on Green Valley School which was submitted to Mr. Paul, attorney for the Miami Herald. The affidavit further stated that as an experienced reporter:

[4] Robert Sherrill deposed that for the last 26 years he has written for newspapers and magazines. Among his employers have been Time, Life, Harper's, Esquire, the New York Times Magazine, and The Miami Herald.

". . . I would expect any reporter worth paying a salary, to examine search warrants and their supporting documents and to put very hard questions to policemen before and after accompanying policemen on any action which involved a search warrant and the invasion of the privacy of homes.

"8. As an experienced reporter I know that police raids involving fifty or more raiders are very unusual. If I were invited to go on such a raid I would be more than exceptionally careful to examine all documents involved, to research the background of the raid, and I would be inclined to regard information from the police as insufficient and probably misleading.

. . . . . .

"11. I have read a transcript of an WESH-TV broadcast alleged to describe conditions at the school. . . . So far as I can see, the report had no purpose other than to try to excuse a raid that was inexcusable and probably illegal."

The article attached to the foregoing affidavit was not sworn to and, when read in conjunction with the affidavit, clearly was not intended to be considered as sworn testimony. By extracting excerpts of the article and excerpts from the affidavit of Lynady, appellees contend that as a matter of law the alleged false statements are true in all material respects.

It is elementary that a summary judgment should be sparingly granted so as not to infringe on the constitutional right to a jury trial;[5] that a summary judgment is not a substitute for trial[6] and should not be granted unless the facts are so crystallized that nothing remains but questions of law.[7]

[5] *Murrell v. Vick*, 178 So.2d 133 (2 Fla.App. 1965).

Green Valley School, Inc. v. Cowles Florida Broadcasti...   327 So. 2d 810 (Fla. Dist. Ct. App. 1976)

6   *Richmond v. Florida Power Light Co.,* 58 So.2d 687 (Fla. 1952).

7   *Shaffran v. Holness,* 93 So.2d 94 (Fla. 1957).

Appellees urge by their brief that:

"As Appellant admits in its brief, to recover against Appellees for libel Appellant as a public figure must satisfy the *New York Times* standard . . . that is it `may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.'"[8]

818   *818

8   *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the U.S. Supreme Court equated reckless disregard for the truth with subjective awareness of probable falsity: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Appellees then quote this court's statement in *Damron v. Ocala Star-Banner Company,* [9] viz:

9   *Damron v. Ocala Star-Banner Company,* 263 So.2d 291 (1 Fla.App. 1972).

"Apparently, the Federal Supreme Court has ruled that a public figure is without recourse when the news media, without proof of `express malice' of `convincing clarity' chooses to publish defamatory falsehoods about such public figure. Thus, we are compelled to affirm the [summary judgment for the defendant]. . . ."

and conclude that there is not a shred of evidence in this record to support any theory of express or actual malice.

*Gertz v. Welch,* [10] in which the United States Supreme Court re-examined the "New York Times" doctrine, left dangling in the air on a case-by-case basis the question of what constitutes a "public figure". A reading of *Gertz* discloses an apparent re-evaluation by that court of its prior immunization of the press from libel actions.

10   *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

*New York Times Co. v. Sullivan* and later cases explicating the doctrine there expressed have been the subject of innumerable appellate decisions, law review articles, and scholarly treatises. The continuous dichotomy created by the need to protect "freedom of press" while preserving "the rights of private individuals and public figures" has to a great extent been resolved by the United States Supreme Court in *Cantrell v. Forest City Pub. Co.,* [11] with only one dissenting opinion. There, Mrs. Cantrell and her son survived a motion for directed verdict, and a judgment in their favor was entered upon a jury verdict. Upon appeal the Sixth Circuit Court of Appeals reversed, holding that the trial judge should have granted defendant's motion for a directed verdict.[12] The United States Supreme Court reversed the Sixth Circuit and directed that the judgment be affirmed as to Forest City Publishing Company and its employee (reporter), Joseph Eszterhas. In so doing, the Supreme Court once again examined *New York Times Co. v. Sullivan,* supra, and *Time, Inc. v. Hill.* [13] Of interest here is that the trial judge instructed the jury that liability could be imposed only if it concludes that the false statements in the Sunday Magazine feature article on the Cantrells had been made with "knowledge of its falsity or in reckless disregard of the truth."[14] In commenting upon the opinion of the appellate court, the Supreme Court stated:

11   *Cantrell v. Forest City Pub. Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974).

12   *Cantrell v. Forest City Pub. Co.,* 484 F.2d 150 (6th Cir. 1973).

Green Valley School, Inc. v. Cowles Florida Broadcasti...    327 So. 2d 810 (Fla. Dist. Ct. App. 1976)

13   *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

14   The Supreme Court, in commenting upon the evidence, stated: "There was no dispute during the trial that Eszterhas, who did not testify, must have known that a number of the statements in the feature story were untrue. In particular, his article plainly implied that Mrs. Cantrell had been present during his visit to her home and that Eszterhas had observed her `wear[ing] the same mask of nonexpression she wore [at her husband's] funeral.' These were `calculated falsehoods,' and the jury was plainly justified in finding that Eszterhas had portrayed the Cantrells in a false light through knowing or reckless untruth."

"The Court of Appeals appears to have assumed that the District Judge's finding of no malice `within the legal definition of that term' was a finding based on the definition of `actual malice' established by this Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 95 A.L.R.2d 1412: `with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not.' As so defined, of course, `actual malice' is a term of art, created to provide a *819 convenient shorthand for the standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers. As such, it is quite different from the common-law standard of `malice' generally required under state tort law to support an award of punitive damages. In a false-light case, common-law malice — frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights — would focus on the defendant's attitude toward the plaintiff's privacy, not towards the truth or falsity of the material published. See *Time, Inc. v. Hill,* 385 U.S. at 396 n. 12, 87 S.Ct. 534, at 546 n. 12, 17 L.Ed.2d 456. See generally W. Prosser, Law of Torts 9-10 (4th ed.)."

Thus, it is "mica" clear that in weighing the facts of this summary judgment proceeding upon the scales of *Cantrell,* supra, the instant summary judgment discharging appellees from liability as a *matter of law* must be reversed.

To uphold appellees' assertion that their entry upon appellant's property at the time, manner, and circumstances as reflected by this record was as a *matter of law* sanctioned by "the request of and with the consent of the State Attorney" and within the "common usage and custom in Florida" could

well bring to the citizenry of this state the hobnail boots of a nazi stormtrooper equipped with glaring lights invading a couple's bedroom at midnight with the wife hovering in her nightgown in an attempt to shield herself from the scanning TV camera. In this jurisdiction, a law enforcement officer is not *as a matter of law* endowed with the right or authority to invite people of his choosing to invade private property and participate in a midnight raid of the premises.[15]

[15] *Fletcher v. Florida Publishing Company,* 319 So.2d 100 (1 Fla.App. 1975).

Finally, we reach the question of the refusal of the trial judge to disqualify himself from further participation in these proceedings. Numerous depositions in the discovery proceedings were taken in open court under the auspices of the trial judge. Appellant sought disqualification of the trial judge by filing motions with affidavits attached. The motions and supporting affidavits do not as a matter of law require a reversal by this court of the judge's order denying same. However, the record as a whole supports appellant's contention that: ". . . Plaintiff fears it will not receive a fair trial in the Court where the above suit is pending. . . ." As was stated by this court in *State ex rel. Arnold v. Revels:* [16]

[16] *State ex rel. Arnold v. Revels,* 113 So.2d 218 (1 Fla.App. 1959).

"We know of nothing more vital in the administration of justice in America than that the judge who sits in judgment on the life, liberty, or property of persons before his court be perfectly impartial. We think it a judge's duty not only to harbor no prejudice toward such persons but also to avoid the appearance of such prejudice."

In the present proceedings it may well be that, if we were able to look into the mind of the trial judge, we would find no actual prejudice toward appellant. However, this record reflects a number of instances (which will not be detailed) in which the trial judge failed to avoid the appearance of bias or prejudice towards appellant. In consideration of "the totality of the circumstances"[17] present in this case, upon remand, we direct the Chief Judge to assign another judge to preside over further proceedings.

[17] *Department of Revenue v. Golder,* 322 So.2d 1 (Fla. 1975).

Reversed and remanded with directions.

SMITH and MILLS, JJ., concur.

820   *820